UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

RUSSELL HARRIS                                                   CIVIL ACTION

VERSUS                                                                  NO. 16-0953

DARREL VANNOY                                                SECTION: "H"(1)

### REPORT AND RECOMMENDATION

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts. Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing. See 28 U.S.C. § 2254(e)(2). Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

Petitioner, Russell Harris, is a state prisoner incarcerated at the Louisiana State Penitentiary in Angola, Louisiana. On June 29, 1999, he was convicted of possession with the intent to distribute cocaine and possession of 28 grams but less than 200 grams of cocaine.[1] On December 3, 1999, he was found to be a fourth offender and was sentenced as such on each conviction to a concurrent term of life imprisonment without benefit of probation, parole, or suspension of sentence.[2] On November 29, 2000, the Louisiana Fourth Circuit Court of Appeal affirmed his convictions and his sentence on the conviction for possession of 28 grams but less than 200 grams

---

[1] State Rec., Vol. 1 of 12, minute entry dated June 29, 1999; State Rec., Vol. 2 of 12, jury verdict forms.
[2] State Rec., Vol. 3 of 12, transcript of December 3, 1999; State Rec., Vol. 1 of 12, minute entry dated December 3, 1999.

of cocaine; however, the court vacated his sentence on the distribution conviction and remanded the matter for resentencing.[3] On November 9, 2001, the Louisiana Supreme Court then denied his related writ application.[4]

After numerous delays, petitioner was finally resentenced on the distribution conviction to a concurrent term of five years imprisonment on March 2, 2011.[5] He again appealed, and, on December 12, 2012, the Louisiana Fourth Circuit Court of Appeal affirmed that sentence.[6]

Petitioner thereafter filed with the state district court a post-conviction application asserting a claim under Brady v. Maryland, 373 U.S. 83 (1963).[7] That application was denied,[8] and relief was likewise denied by the Louisiana Fourth Circuit Court of Appeal[9] and the Louisiana Supreme Court.[10]

Petitioner then filed the instant federal application seeking habeas corpus relief reasserting his Brady claim.[11] The state filed a response conceding that the application is timely but arguing that petitioner's claim has no merit.[12]

## Standards of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal habeas corpus legislation, including 28 U.S.C. § 2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for pure questions of fact, pure questions of law, and mixed questions of both. The amendments "modified a federal habeas court's role in

---

[3] State v. Johnson, 780 So.2d 403 (La. App. 4th Cir. 2000); State Rec., Vol. 4 of 12.
[4] State v. Johnson, 801 So.2d 358 (La. 2001); State Rec., Vol. 4 of 12.
[5] State Rec., Vol. 10 of 12, transcript of March 2, 2011; State Rec., Vol. 1 of 12, minute entry dated March 2, 2011.
[6] State v. Harris, No. 2012-KA-0618, 2012 WL 6553817 (La. App. 4th Cir. Dec. 12, 2012); State Rec., Vol. 11 of 12.
[7] State Rec., Vol. 12 of 12.
[8] State Rec., Vol. 12 of 12, Order dated December 2, 2013.
[9] State v. Harris, 2014 K-1088 (La. App. 4th Cir. Nov. 26, 2014); State Rec., Vol. 12 of 12.
[10] State ex rel. Harris v. State, 183 So.3d 1284 (La. 2016); State Rec., Vol. 12 of 12.
[11] Rec. Doc. 3.
[12] Rec. Doc. 13.

reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." Bell v. Cone, 535 U.S. 685, 693 (2002).

As to pure questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); see also 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

As to pure questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Courts have held that the "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning." Bell, 535 U.S. at 694.

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals has explained:

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases. A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the [United States] Supreme Court and nevertheless arrives at a result different from [United States] Supreme Court precedent.

Wooten v. Thaler, 598 F.3d 215, 218 (5th Cir. 2010) (internal quotation marks, ellipses, brackets, and footnotes omitted).

Regarding the "unreasonable application" clause, the United States Supreme Court has held: "[A] state-court decision is an unreasonable application of our clearly established precedent if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case." White v. Woodall, 134 S. Ct. 1697, 1706 (2014). However, the Supreme Court cautioned:

> Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error. Thus, if a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision. AEDPA's carefully constructed framework would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law.

Id. (citations and quotation marks omitted). Therefore, when the Supreme Court's "cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established Federal law." Wright v. Van Patten, 552 U.S. 120, 126 (2008) (quotation marks and brackets omitted). The Supreme Court has also expressly cautioned that "an unreasonable application is different from an incorrect one." Bell, 535 U.S. at 694. Accordingly, a state court's merely incorrect application of Supreme Court precedent simply does not warrant habeas relief. Puckett v. Epps, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable.").

While the AEDPA standards of review are strict and narrow, they are purposely so. As the United States Supreme Court has held:

> [E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable.
>
> If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther. Section 2254(d) reflects the view that habeas corpus is a guard against *extreme malfunctions* in the state criminal justice systems, *not a substitute for ordinary error correction through appeal. As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.*

Harrington v. Richter, 562 U.S. 86, 102-03 (2011) (citations omitted; emphasis added); see also Renico v. Lett, 559 U.S. 766, 779 (2010) ("AEDPA prevents defendants – and federal courts – from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts.").

The Supreme Court has expressly warned that although "some federal judges find [28 U.S.C. § 2254(d)] too confining," it is nevertheless clear that "all federal judges must obey" the law and apply the strictly deferential standards of review mandated therein. White v. Woodall, 134 S. Ct. 1697, 1701 (2014).

**Facts**

In the first direct appeal, the Louisiana Fourth Circuit Court of Appeal summarized the facts of this case as follows:

> Detective Michael Lohman, NOPD officers and DEA Agents participated in obtaining a search warrant for, and conducting surveillance of, C & G Liquor store, located in the 5500 block of North Galvez Street. At approximately 1:30 p.m. on 9 October 1998, Detective Lohman observed Terrance Johnson, one of the targets of the investigation, loitering in front of the liquor store. Detective Lohman noted several instances where a subject would approach Johnson, engage in brief conversation, and then enter the store followed by Johnson. Moments later the individual would exit the store, not carrying any items, and then leave the area. Johnson would then resume loitering in front of the store, counting money in his

5

hands, until the next subject approached him. Based on these observations, Detective Lohman suspected narcotics activity. Shortly before 2:00 p.m., Russell Harris arrived in a black Mitsubishi Diamonte accompanied by Mario Breedlove. Both men entered the store followed by Johnson. Shortly thereafter, Johnson exited the store and resumed his suspect behavior. Satisfied there was drug activity at the location, Detective Lohman signaled back up officers to execute the warrant.

Johnson walked across the street to another store where he was intercepted by officers and returned to the target location. As officers entered C & G they encountered four individuals behind the counter, who were secured, and advised of the search warrant. Detective Lohman advised the detainees of their Miranda rights, placed them under arrest, and began searching the store. Officers found a "slab" of rock cocaine and $191 in the cash register. A search of the beverage cooler yielded 23 grams of crack cocaine. Russell Harris, Terrance Johnson, Greg Morris and Mario Breedlove were arrested for possession of cocaine.

Searching the store further, the officers discovered a razor blade containing a white residue; two cigar boxes containing glass tubes, wire mesh and small plastic bags, items common to narcotics consumption and packaging; one digital and twelve handheld metal scales. Harris told Detective Lohman that he owned the store, and lived with his mother at 2516 Mazant Street. Harris agreed to cooperate in the investigation, and signed a consent to search form, allowing the search of his residence. However, the Mazant Street address was a gutted building.

After conferring with Sgt. Little, the officers and Harris relocated to 2210 Alabo Street where Detective Lohman noticed Harris' black Mitsubishi Diamonte parked in the driveway, and encountered Lakesha James, Harris' common-law wife, exiting the residence. James verified that Harris lived with her at that address, but became uncooperative and belligerent upon learning of the investigation and the detective's suspicions that additional narcotics were being stored in the residence.

Sgt. Little returned to headquarters to obtain a search warrant for the house while other officers secured the premises. However, prior to issuance of the warrant, James agreed to cooperate with the investigation, and signed a consent to search form allowing the officers to search the residence. She unlocked the security bars on the front door, escorted the officers to the master bedroom where she unlocked a dead bolt on the bedroom door, and directed Detective Lohman to a .38-caliber revolver under the mattress. She denied the presence of any narcotics in the house; however officers seized approximately fifty-four grams of crack cocaine from atop the bedroom dresser and a bag of glass tubes. In addition, Detective Lohman confiscated an invoice and subpoena, both addressed to Russell Harris at 2210 Alabo Street, and a photograph of Harris and James. While at the Alabo Street residence, Detective Lohman obtained a set of keys from Harris. One key unlocked the security bars on the front of the residence; a second key fit the front door of the residence, and the third key operated the dead bolt on the master bedroom. Upon completion of the residence search, all of the defendants were transported to the police station for processing. Officers seized $376.00 from Greg Morris, $121.00 from Russell Harris and $79.00 from Terrance Johnson, who had a seizure at the station, and was transported to Charity Hospital for treatment. Some time later,

Charity Hospital gave Detective Lohman a plastic bag containing several pieces of cocaine.

Dr. Kathleen Hubbel testified by stipulation as an expert in the field of emergency medicine. She stated that Terrance Johnson arrived at Charity Hospital on 9 October 1998, with complaints of possible seizure. He exhibited rapid heartbeat, elevated blood pressure, and tremors and told her that he had ingested the equivalent of fifty rocks of cocaine several hours before his arrival at the hospital. In the course of having his stomach pumped, Johnson disgorged a small plastic bag containing rock-like pieces of a white substance, which Dr. Hubbel turned over to the police.

Officer Kenneth Cureau testified that he assisted in the search of C & G liquor store. The only evidence he recovered was the bag of cocaine from the beverage cooler. He also stated that he accompanied Terrance Johnson to Charity Hospital after he had a seizure and fell out of a chair striking his head. En route to the hospital, Johnson told Officer Cureau that he swallowed a quarter ounce of crack cocaine. After Dr. Hubbel treated Johnson, she gave Officer Cureau a bag of cocaine pumped from Johnson's stomach. He turned the bag over to the evidence room.

Detective Barret Morton testified that he participated in the investigation of the C & G liquor store. He detained Terrance Johnson and patted him down. He also stated that he assisted in the search of the Alabo Street residence, and recovered a bundle of glass tubes. Detective Morton met Lakesha James and heard her say that Russell Harris lived at that address. He was one of the officers who received the bag of cocaine that Charity Hospital pumped from Terrance Johnson's stomach.

Michael Christopher Cooley, special agent with the Drug Enforcement Administration, testified that he, fellow agent Michael Alston and other DEA agents assisted Detective Lohman and the NOPD with their investigation of the C & G liquor store. Agent Cooley helped search the liquor store. He opened the cash register, located the cocaine and currency, and alerted Detective Lohman. He helped secure the premises. He relocated to the 2210 Alabo Street residence with other officers, but did not enter the premises.

Sgt. Bruce Little testified that he was the supervising officer in the C & G liquor store case, but Detective Lohman was the case agent. Sgt. Little was part of the take down force assisting Lohman and was the first officer inside the liquor store. He entered the store under the guise of investigating a recent burglary at the store, and asked to speak with the owner. Russell Harris responded that he was the owner. On a pre-arranged signal, takedown officers entered the store and helped secure the defendants. Sgt. Little made a sweep of a back room for security purposes. The officers informed the defendants of their rights, gave Russell Harris a copy of the warrant and proceeded to search the premises. Sgt. Little saw the contraband and other evidence seized pursuant to the warrant. After completing the search of the liquor store, Sgt. Little went to the 2210 Alabo Street residence. He saw Russell Harris' black Diamonte parked in the driveway. He explained the police presence to James, and when she refused to cooperate, he left to secure a search warrant for the residence. Prior to obtaining the warrant, he was summoned to the residence because James signed a consent to search form. At this point, Sgt.

7

Little's testimony tracked Detective Lohman's recounting the search and seizure of contraband from the residence.

Officer Melody Young testified that she and Sgt. Eddie Selby were on routine patrol on 17 January 1999, in a marked police vehicle on Caffin Avenue. As they approached the intersection of Caffin Avenue and Galvez Street, they saw Terrance Johnson standing on the corner talking with several black males. Officer Young witnessed Johnson engage in what she believed was a hand to hand drug transaction. The officers stopped and the suspects fled. Johnson walked into a nearby store. She entered the store, saw Johnson standing at the counter with his hand partially out of his pocket with a plastic bag protruding from his pocket. As she handcuffed Johnson, she told him he was under investigation for drug trafficking. Incident to his arrest, she recovered twenty-one pieces of crack cocaine and $31.

Sgt. Eddie Selby testified, corroborating Officer Young's testimony.

Officer William Giblin, NOPD criminalist and expert in the field of analysis and classification of controlled dangerous substances, testified that the rock-like substances seized pursuant to Terrance Johnson's 17 January 1999 arrest tested positive for cocaine.

Officer Harry O'Neal, drug chemist with the NOPD crime lab and expert in the analysis of controlled dangerous substances, was further qualified as an expert in the identification of drug paraphernalia and the use, packaging and distribution of controlled dangerous substances, particularly cocaine. Officer O'Neal explained his testing methods on the contraband seized from the C & G liquor store and the Alabo Street residence. The evidence tested positive for cocaine. He further testified that in his twelve and a half years of police experience with controlled substances, the type of scales confiscated at the liquor store are frequently used to weigh contraband before packaging. Upon examination of the glass tubes, copper mesh wire and plastic bags seized in the search of the liquor store and residence, Officer O'Neal said that the objects were the type associated with drug paraphernalia. Further explaining "drug paraphernalia", the officer testified that wire mesh and glass tubes are used in making crack pipes and the scales and plastic bags are employed in packaging drugs, particularly cocaine and marijuana, for street sale. For "demonstrative purposes" Officer O'Neal displayed crack pipes from other cases to show how the pipe is constructed from glass tubes and wire mesh.

Darryl Harrell, a defense witness, testified he is a cosmetologist and that on 9 October 1998, at approximately 12:30 p.m. he was getting off the bus near the C & G liquor store. Greg Morris, Terrance Johnson and Mario Breedlove were at the liquor store. Greg Morris called to Harrell to come fix his hair. While attending to Morris, Russell Harris came in and asked him to fix his hair. Harrell told Harris he (Harris) would have to get hair supplies. Harrell was in the back of the store busy with Morris when Harris and Greg Morris left the store for hair supplies. Harris and Morris did not return until about five minutes before Detective Lohman arrived. As Harrell was leaving the liquor store to get a hair dryer, Detective Lohman came in asking for the owner of the store. Harrell directed him to the back of the premises, but instead of leaving, the detective forced his way into the store and

8

refused to allow anyone to leave because they were under investigation. Detective Lohman did not identify himself as an officer.

Lakeesha James testified that she lived at 2210 Alabo Street with her two daughters. Russell Harris is her daughters' father. On the day he was arrested, she went to the liquor store and removed the Diamonte vehicle to her driveway. Shortly afterward, Detective Alston came to her house and asked to speak with her. She spoke to him about one hour during which time he told her to ask the five adults and five children visiting her to leave the house. Detective Lohman arrived and told her if she did not allow the police to enter her house, he would get a warrant. When she refused him entrance, Detective Lohman attempted to grab her keys. She and Lohman argued. Sgt. Little arrived and joined the conversation. The officers threatened to take everyone in the house to jail if she did not cooperate and contraband was found in the house. She signed a consent to search form and unlocked the front gate and the door to her bedroom. The officers found the .38 caliber gun where she told them it would be, and then made her step back into the front of the residence while they searched the house. She said that Russell Harris did not live with her and did not have keys to her house. She further stated that she had never seen any of the items the officers said they found in the search.

Joycelyn Harris, Russell Harris' mother, testified that she was at Lakeesha James' house the afternoon her son was arrested. Lakeesha James is her son's ex-girlfriend; they have two children. The police were already at Lakeesha's house when Joycelyn Harris arrived. When James allowed the police to enter her house, Joycelyn Harris accompanied them and saw one officer enter the house carrying a black bag. Harris testified that her son worked at C & G liquor store.

Cathryn Williams testified that she was visiting Lakeesha James on 9 October 1998. A man came to the back of the house and told her to open the door. Shortly afterward, the police arrived and told everyone to leave the house. James and Joycelyn Harris went back into the house with the police.

Sgt. Bruce Little was re-called on behalf of the State. He testified that when he entered the C & G liquor store, he identified himself as a burglary detective. At that point one of the three people behind the partition opened the door. He produced identification, and asked to speak to the owner. Russell Harris identified himself as the owner. Sgt. Little then gave the prearranged signal to the take down team and the rest of the agents entered the building. The sergeant explained that Agent Alston entered the Alabo Street location carrying his black briefcase, containing rubber gloves, evidence bags, tape recorder, notebook, etc., but no drugs. After searching Lakeesha James' house, she was released because he could find no connection between her and the contraband found in her house.[13]

## Petitioner's Claim

Petitioner claims that his rights were violated when the prosecution withheld from the defense a copy of the search warrant showing that the warrant was not signed by the judge until

---

[13] State v. Johnson, 780 So.2d 403, 407-11 (La. App. 4th Cir. 2000); State Rec., Vol. 4 of 12.

9

*after* the search had already been conducted. The state district court denied that claim without assigning reasons.[14] Thereafter, the Louisiana Fourth Circuit Court of Appeal refused to consider petitioner's related writ application on procedural grounds.[15] The Louisiana Supreme Court then denied petitioner's claim on the merits, stating simply: "Relator fails to show the state withheld material exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct 1194, 10 L.Ed.2d 215 (1963)."[16]

The AEDPA places severe limitations on this Court's review of the Louisiana Supreme Court's decision rejecting petitioner's Brady claim. The United States Fifth Circuit Court of Appeals has explained:

> Under AEDPA, [a federal court] do[es] not decide *de novo* whether a state prisoner has sufficiently proven a Brady violation. See Yarborough v. Alvarado, 541 U.S. 652, 665, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004) ("We cannot grant relief under AEDPA by conducting our own independent inquiry into whether the state court was correct as a *de novo* matter."); Neal v. Puckett, 286 F.3d 230, 236 (5th Cir. 2002) (*en banc*) ("We have no authority to grant habeas corpus relief simply because we conclude, in our independent judgment, that a state supreme court's application of [federal law] is erroneous or incorrect."). Rather, [a federal court] decide[s] whether the state court's Brady determination resulted in a decision

---

[14] State Rec., Vol. 12 of 12, Order dated December 2, 2013.

[15] The Court of Appeal held: "The application for supervisory writ of review fails to identify when (or whether) his PCR was filed in the district court, the date on which the district judge ruled on his application, and whether he furnished notice of intention to seek supervisory relief to the district judge." State v. Harris, 2014 K-1088 (La. App. 4th Cir. Nov. 26, 2014); State Rec., Vol. 12 of 12.
   To the extent that petitioner argues that the Louisiana Fourth Circuit Court of Appeal erred in refusing to consider his application, that argument is not cognizable. The error, if any, occurred in the state post-conviction proceedings, and the United States Fifth Circuit Court of Appeals has explained:

> [O]ur circuit precedent makes abundantly clear that errors in state post-conviction proceedings will not, in and of themselves, entitle a petitioner to federal habeas relief. See, e.g., Hallmark v. Johnson, 118 F.3d 1073, 1080 (5th Cir. 1997) ("[I]nfirmities in state habeas proceedings do not constitute grounds for relief in federal court."); Nichols v. Scott, 69 F.3d 1255, 1275 (5th Cir. 1995) ("An attack on a state habeas proceeding does not entitle the petitioner to habeas relief in respect to his conviction, as it is an attack on a proceeding collateral to the detention and not the detention itself.") (internal quotations omitted). Rather, we must find constitutional error at the trial or direct review level in order to issue the writ.

Morris v. Cain, 186 F.3d 581, 585 n.6 (5th Cir. 1999). Moreover, in any event, the Court notes that any error of the Court of Appeal was rendered moot by the fact that the Louisiana Supreme Court thereafter independently reviewed and rejected petitioner's claim on the merits.

[16] State *ex rel.* Harris v. State, 183 So.3d 1284 (La. 2016); State Rec., Vol. 12 of 12.

that is contrary to, or involved an unreasonable application of, clearly established federal law. Busby v. Dretke, 359 F.3d 708, 717 (5th Cir. 2004).

Dickson v. Quarterman, 462 F.3d 470, 477-78 (5th Cir. 2006).

As noted, in the last reasoned state court opinion addressing petitioner's claim, the Louisiana Supreme Court cited Brady in denying petitioner's claim. Because the court correctly identified the clearly established federal law governing petitioner's claim, and because he has not pointed to (and the undersigned's research has not found) a United States Supreme Court case with materially indistinguishable facts reaching a contrary result, this Court need only determine whether the Louisiana Supreme Court's application of Brady was "unreasonable." For the following reasons, the undersigned concludes that it was not.

With respect to a claim that the prosecution withheld evidence in violation of Brady and its progeny, the United States Supreme Court has held:

> A Brady violation occurs when the government fails to disclose evidence materially favorable to the accused. This Court has held that the Brady duty extends to impeachment evidence as well as exculpatory evidence, and Brady suppression occurs when the government fails to turn over even evidence that is known only to police investigators and not to the prosecutor.

Youngblood v. West Virginia, 547 U.S. 867, 869-70 (2006) (internal citations and quotation marks omitted). Therefore, to prevail on a Brady claim, a petitioner "must show that (1) the state withheld evidence, (2) the evidence was favorable to the accused, and (3) the evidence is material to guilt or punishment." DiLosa v. Cain, 279 F.3d 259, 262-63 (5th Cir. 2002).

In the instant case, petitioner's Brady claim is based on a copy of the Search Warrant signed by the judge which, crucially, *has the notation "6:32 pm" written next to the judge's signature*.[17] In his state post-conviction application, petitioner indicates that this document was withheld from the defense and not discovered by him until he received a copy of the District Attorney's file in

---

[17] Rec. Doc. 3-2, p. 50.

2011.  The state argues otherwise and notes that no such document is contained within the District Attorney's files – the copies in those files have *no time* written by the judge's signature.  Based on that fact, the state argues not only that the document in question was not withheld by the state (in that the state possessed no such document) but also that its very authenticity is suspect.[18]

The undersigned likewise finds the copy of the search warrant produced by petitioner to be suspect.  Both at a pretrial suppression hearing and at trial, Detective Michael Lohman testified that he obtained the search warrant *prior* to beginning surveillance of the store at *1:30 p.m.* on October 9, 1998.  Moreover, a copy of the actual search warrant was introduced both at the pretrial hearing[19] and at trial.[20]  However, despite that fact, no question was raised in either proceeding concerning the timing of the warrant's issuance and signature by the judge.  Therefore, one can reasonably conclude that the copies of the warrant introduced on those occasions, like the copies the state has produced in connection with the instant proceeding, must not have included the handwritten notation indicating that the judge signed the warrant at "6:32 pm."  That fact, coupled with the state's representation that the District Attorney's file contains no such document, casts grave doubt on the authenticity of petitioner's document and the veracity of his statement that he discovered it within the copy of the District Attorney's file he received in 2011.  Accordingly, the undersigned finds that petitioner has failed to establish that the document on which his claim is premised is authentic, much less that it was suppressed by the state.  As a result, he has not met his burden to show that the Louisiana Supreme Court's decision denying his Brady claim was unreasonable.

---

[18] Rec. Doc. 13, pp. 17-18; Rec. Doc. 13-2, p. 19; Rec. Doc. 13-3, p. 21.
[19] See State Rec., Vol. 2 of 12, transcript of March 15, 1999, p. 5.
[20] See State Rec., Vol. 2 of 12, trial transcript, p. 12.

12

Lastly, out of an abundance of caution, the undersigned notes that if petitioner is additionally seeking to have this Court determine the validity of the underlying search conducted pursuant to the warrant, the Court cannot oblige. Such a claim would arise under the Fourth Amendment and be barred by Stone v. Powell, 428 U.S. 465 (1976).

In Stone, the United States Supreme Court held that where a state provides an opportunity for full and fair litigation of Fourth Amendment claims in the state courts, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence against him was obtained in an unconstitutional search and seizure. Id. at 494 (footnote omitted); see also Janecka v. Cockrell, 301 F.3d 316, 320 (5th Cir. 2002). Interpreting Stone, the United States Fifth Circuit Court of Appeals has held:

> An "opportunity for full and fair litigation" means just that: an opportunity. If a state provides the processes whereby a defendant can obtain full and fair litigation of a fourth amendment claim, Stone v. Powell bars federal habeas corpus consideration of that claim whether or not the defendant employs those processes.

Caver v. Alabama, 577 F.2d 1188, 1192 (5th Cir. 1978). Therefore, the Stone bar applies even in those cases where no motion to suppress was ever filed. Id. at 1192-93. The Stone bar further applies even if the state court ruling on the Fourth Amendment claim was erroneous. Swicegood v. Alabama, 577 F.2d 1322, 1324 (5th Cir. 1978).

Stone would clearly apply here, in that "[i]t is beyond cavil that Louisiana courts provide criminal defendants the opportunity to raise Fourth Amendment claims." Bailey v. Cain, Civil Action No. 06-839, 2007 WL 1198911, at *13 (E.D. La. Apr. 20, 2007). As a result, Stone would prohibit this Court from reviewing petitioner's underlying Fourth Amendment claim.

## RECOMMENDATION

It is therefore **RECOMMENDED** that the federal application for habeas corpus relief filed by Russell Harris be **DISMISSED WITH PREJUDICE**.

13

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  28 U.S.C. § 636(b)(1); Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[21]

New Orleans, Louisiana, this sixteenth day of February, 2017.

                                               _____
                                               **JANIS VAN MEERVELD**
                                               **UNITED STATES MAGISTRATE JUDGE**

---

[21] Douglass referenced the previously applicable ten-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.